## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) CHAD EDWARD LEATHERMAN, an individual,<br><br>      Plaintiff,<br><br>v.<br><br>(1) CORECIVIC, INC., a foreign for-profit corporation;<br><br>(2) MICHAEL SIZEMORE, in his individual capacity as Warden of Cimarron Correctional Facility;<br><br>(3) STEPHEN PAINE, and;<br><br>(4) DEFENDANTS DOES 1-X;<br><br>      Defendants. | Case No.  21-cv-00065-GKF-JFJ<br><br><br><br>ATTORNEY LIEN CLAIMED<br>JURY TRIAL DEMANDED |

## COMPLAINT

**COMES NOW**, the Plaintiff Chad Edward Leatherman ("Plaintiff" or "Mr. Leatherman"), by and through his attorneys of record, SMOLEN | LAW, PLLC, and for his causes of action against the above-captioned Defendants, alleges and states the following:

## JURISDICTION & VENUE

1.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

2.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

3.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), as all parties are residents of the state of Oklahoma, and, at least one Defendant, i.e., Defendant CoreCivic, Inc., resides in this this judicial district pursuant to 28 U.S.C. § 1391(c)(2) (*see* ¶ 5, *infra*).

## PARTIES

4.     Plaintiff is a resident of the State of Oklahoma, currently incarcerated at the Davis Correctional Facility, located in Davis, Oklahoma

5.     Defendant CoreCivic, Inc. ("CoreCivic") f/k/a Corrections Corporation of America, Inc., is a foreign corporation doing business in Oklahoma. CoreCivic is a private corrections company that contracts with the Oklahoma Department of Corrections ("DOC") and counties, including, Tulsa County, to operate private prisons. CoreCivic was at all times relevant hereto responsible, in part, for providing care and supervision to Mr. Leatherman while he was in the custody of the DOC at Cimarron Correctional Facility ("Cimarron" or "Cimarron Correctional Facility") in the town of Cushing, in Payne County, State of Oklahoma. CoreCivic was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the housing and supervision of inmates at Cimarron Correctional Facility, and for training and supervising its employees. CoreCivic was, at all times relevant hereto, endowed by Payne County and the state of Oklahoma with powers or functions governmental in nature, such that CoreCivic became an agency or instrumentality of the State and subject to its constitutional limitations.

6.    Defendant Michael Sizemore ("Warden Sizemore" or "Defendant Sizemore"), a CoreCivic employee, is the warden of Cimarron Correctional Facility, acting under the color of state law. Upon information and belief, Warden Sizemore resides in Payne County, Oklahoma. Warden Sizemore is sued in his individual capacity under the theory of supervisory liability.

7.    Defendant Stephen Paine was a CoreCivic employee, acting under the color of state law at all times relevant hereto. Upon information and belief to be confirmed through discovery, Defendant Stephen Paine resides in Payne County, Oklahoma.

8.    Defendants DOES 1-X are detention and medical staff, unidentified at this time, and, as described more fully below, who committed underlying violations of Mr. Leatherman's constitutional rights.

## FACTUAL ALLEGATIONS

9.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 8, as though stated verbatim below.

**A.  The Conditions of Imprisonment to Which Plaintiff is Subjected.**

10.   Mr. Leatherman is currently an inmate at the Davis Correctional Facility, located in Davis, Oklahoma. Davis Correctional Facility is also owned and operated by Defendant CoreCivic. Mr. Leatherman was transported to Davis Correctional Facility from Cimarron Correctional Facility in October of 2020 after Cimarron was closed.

11.   In June of 2018, Mr. Leatherman was housed in a cell with a cell mate. Mr. Leatherman and his cell mate slept on bunk beds. Mr. Leatherman was assigned the top bunk.

12.   In 2018, during Mr. Leatherman's incarceration, the Doe Defendants, acting upon instruction and direction from Defendant Sizemore, removed the ladders to the top bunks of the

beds in Cimarron Correctional Facility cells. Inmates assigned to a top bunk were thus forced to climb into their bunks without the assistance of a ladder.

13.      At approximately 5:00 A.M. on July 26, 2018, Mr. Leatherman attempted to disembark from his top bunk without the assistance of a ladder. As he was scaling down from his bed, Mr. Leatherman lost his balance and fell to the floor of his cell.

14.      Mr. Leatherman immediately experienced severe pain in his right lower leg. Plaintiff was transported to Cimarron Correctional Facility's medical center, where he was evaluated by Dr. Stephen Paine.

15.      Dr. Paine ordered an x-ray of Mr. Leatherman's right tibia/fibula and prescribed Mr. Leatherman pain medication.

16.      At 4:42 P.M. Dr. Paine determined via the x-ray, that Mr. Leatherman had fractured his right tibia and fibula in the fall.

17.      After laying in the medical center in writhing pain for over 24 hours, Mr. Leatherman was transferred to OU Medical Center in Oklahoma. At OU Medical Center it was determined that Mr. Leatherman had a "severely comminuted" fracture of his tibia and fibula.

18.      On July 27, 2018, Mr. Leatherman underwent surgery to insert titanium plates and screws into both the tibia and fibula of his right leg as a result of the fall.

19.      On August 2, 2018, Mr. Leatherman had to undergo a second surgery to his leg at OU Medical Center.

20.      After the second surgery, Mr. Leatherman remained at OU Medical Center until August 7, 2018 to be monitored by the trauma team. Mr. Leatherman was eventually released back to Cimarron Correctional Facility on August 8, 2018 with specific medical orders for his knee to

remain straight for 2-3 weeks and that non-weightbearing for 12 weeks. Mr. Leatherman was instructed to use crutches, walker, or wheelchair to ambulate.

21.     Mr. Leatherman further received physical therapy at Lindsay Municipal Hospital from August 7, 2018 until August 17, 2018.

22.     Upon returning to Cimarron Correctional Facility Mr. Leatherman was not placed in a medical cell or provided access to a bottom bunk. Instead, Mr. Leatherman was forced to continue climbing on and off of the top bunk without a ladder.

23.     When Mr. Leatherman asked for a ladder, Cimarron staff refused to accommodate him, despite his medical concerns. Cimarron Correctional Facility staff instructed Mr. Leatherman to "do the best he could" when climbing on and off of his top bunk.

24.     At the conclusion of his treatment with the OU Medical Center, Mr. Leatherman received treatment within Cimarron Correctional Facility for his worsening limp in his right leg.

25.     On August 21, 2018, Cimarron staff provided Mr. Leatherman with a document containing six (6) pictures of exercises he could perform himself, without the help of a medical professional.

26.     Mr. Leatherman performed the recommended exercises, but it did not ease his pain. Mr. Leatherman's began to ambulate with an obvious limp.

27.     On October 12, 2018 Mr. Letterman submitted a medical request to DOC requesting Dr. Paine to look at his right leg, because it felt like it was still broken.

28.     On March 31, 2019 Mr. Letterman submitted a medical request whereby he stated that it felt like the "screw is coming through skin on right leg where hardware is, burns and throbs constantly and can feel bump like size of a b.b."

29.     In response to his medical request, Mr. Leatherman was evaluated by Dr. Paine at Cimarron on April 18, 2019. The notes from the encounter state that Mr. Leatherman was complaining of pain in his right leg, "specifically over hardware site at anterior shin and in Rt. knee." Dr. Paine informed Mr. Leatherman of the post traumatic changes in his leg and recommended that Mr. Leatherman wear anti-embolic stockings to ease the pain.

30.     On July 8, 2019, Mr. Leatherman was seen at OU Medical Center for a one year follow up from his surgery, whereby he described the ongoing pain he was experiencing in his knee. It was determined at that visit that Mr. Leatherman had developed medial compartment knee arthritis as a result of the injury.

31.     Medial compartment arthritis can often develop as a result of a leg fracture the subsequent recovery. Common treatments for medial compartment arthritis include, but are not limited to, physical therapy, ice and heat therapy, and pain medication.

32.     At each of his visits with Dr. Paine, and to other facility employees and medical staff, Mr. Leatherman pointed out that his self-guided physical therapy was not working, however further treatment was denied as Cimarron staff claimed that it did not offer physical therapy.

33.     Despite his many requests, Mr. Leatherman has not been provided with any further substantive treatment for his leg and knee.

34.     As a result of CoreCivic's failure to provide medical treatment to Mr. Leatherman, his leg has not fully recovered, and he has not regained the level of ability to walk he possessed prior to the fall. Mr. Leatherman still suffers from severe knee pain. Mr. Leatherman continues to be required to utilize the top bunk without a ladder despite his injury.

35.    Mr. Leatherman attempted to seek resolution of his complaints through Cimarron's internal grievance policy, however he was unable to complete such process due to the restrictions brought about by the COVID-19 pandemic and state of emergency.

36.    On April 21, 2020, Mr. Leatherman submitted two "Request to Staff" grievances about his fall from the bed and his lack of medical treatment following his surgery. The "Request to Staff" specifically states that the grievance "must be submitted through the law library."

37.    On April 23, 2020, Cimarron staff responded to Mr. Leatherman's "Request to Staff" by stating that (1) Mr. Leatherman needed to submit a sick call request in order to be evaluated by the nurse and (2) the ladders to the bunk beds were removed "due to security concerns."

38.    In order to complete the formal grievance process, Mr. Leatherman needed access to the library within Cimarron. Due to the Coronavirus, the Cimarron law library was permanently closed, prohibiting Mr. Leatherman from completing the formal grievance process.

39.    Statute of limitations applicable to a § 1983 action are tolled while a prisoner pursues administrative remedies mandated under the Prison Litigation Reform Act (PLRA). *Johnson v. Garrison*, 2020 WL 1487653 (10th Cir. 2020).

40.    A failure to respond to a grievance may be grounds for finding that an administrative remedy is unavailable. *Jerniga v. Stuchelln,* 304 F.3d 1030, 1032 (10th Cir. 2002). Or if prison officials fail to respond within the time limits provided by the grievance procedure the prisoner may be deemed to have exhausted available administrative remedies. *Whitington v. Ortiz,* 472 F.3d 804, 807–808 (10th Cir. 2007).

41.    The closure of the Cimarron law library inhibited Mr. Leatherman's ability to complete the internal grievance process as presented by staff.

## B. CoreCivic's Corporate Culture of Indifference Toward Inmates

42.     CoreCivic was founded in 1983 and currently houses approximately 90,000 inmates in its more than 60 facilities nationwide, which resulted in approximately $160 million in net profit in 2018.

43.     Up until 2016, CoreCivic was known as Corrections Corporation of America ("CCA"). It has been widely reported that CoreCivic changed its name in an effort to combat mounting criticism for its woefully inadequate prisons that led to deplorable conditions for its inmates.[1]

44.     CoreCivic currently owns and operates two (2) prisons in Oklahoma: Cimarron Correctional Facility and the Davis Correctional Facility, which is located Holdenville, Oklahoma.

45.     CoreCivic also owns, and formerly operated, additional prisons in Oklahoma, including Diamondback Correctional Facility ("Diamondback") in Watonga, Oklahoma and North Fork Correctional Facility ("North Fork") in Sayre, Oklahoma.

46.     Diamondback, which was constructed in 1998, closed in 2010 after losing a federal contract to house prisons. Diamondback was plagued with myriad issues related to inadequate treatment and supervision of prisoners. A notable example being inmate riots that broke out in 2004.[2]

47.     North Fork, despite being located in Oklahoma, was built to house California inmates. North Fork experienced similar problems, including rioting in 2000 (on two separate occasions) and 2011. Shortly after the 2011 riot, the state of California ended its contract with

---

[1]     Becca Andrews, *Private Prison Company Frees Itself From Its Old Corporate Identity*, Mother Jones, https://www.motherjones.com/politics/2016/10/corrections-corporation-america-private-prison-rebranding/ (last visited Oct. 21 2020)
[2]     Matthew Brady, *Report Says Riot Lasted for Hours*, The Oklahoman (July 8, 2004), https://oklahoman.com/article/2858180/report-says-riot-lasted-for-hours.

North Fork, which severely affected the profitability of the prison, causing it to close. CoreCivic now leases the North Fork facility to the Oklahoma Department of Corrections.[3]

48.     Between October 2014 and August 2015, three inmates were found murdered by other inmates at the Davis Correctional facility.[4]

49.     It is undeniable that prisons are often inherently dangerous places. However, CoreCivic has maintained a culture of indifference towards its inmates' safety and serious medical needs within its facilities. CoreCivic has established a practice or policy of inadequately staffing its facilities, inadequately training the employees it does staff in how to properly care for or supervise inmates, failing to properly document serious incidents, and failing to make any efforts to rectify the sub-par conditions that lead to routine injuries to inmates within its prisons. When authorities have attempted to investigate violence or other misconduct at CoreCivic facilities, CoreCivic has gone to great lengths to conceal their inadequacies, going so far as to purposely falsify documents and destroy crucial evidence. For instance:

   a.   In 2010, the FBI began investigating CoreCivic's (CCA at the time) policies and practices following an incident in which an inmate brutally beat another inmate unconscious at the Idaho Correctional Center. A video revealed that nearby guards stood by idly, watching the vicious beating. The American Civil Liberties Union ("ACLU") filed a lawsuit in the United States Court for the District of Idaho in March 2010 that alleged that guards were failing to protect inmates from violence by other inmates. The ACLU ultimately reached a settlement with CCA in

---

[3]      Graham Lee Brewer, *Board of Corrections approves private prison rental*, The Oklahoman (May 5, 2016), https://oklahoman.com/article/5496206/board-of-corrections-approves-private-prison-rental?.

[4]      Parker Perry, *Trio of homicides at Holdenville Prison, McAlester News-Capital* (August 16, 2020), https://www.mcalesternews.com/news/trio-of-homicides-at-holdenville-prison/article_40f5699a-42bf-11e5-8041-97193b89c481.html.

September 2011 and was awarded $349,000 in attorneys' fees. Part of the settlement agreement ordered CCA to increase staffing levels at the Idaho facility.

b.   In 2012, however, the Idaho Department of Corrections ("IDOC") discovered that CCA had been falsifying staffing numbers and that it was failing to comply with the settlement agreement. The investigation found that CCA had overreported a total of approximately 4800 staffing hours in 2012. In 2013, a federal judge held CCA in contempt of court for persisting to understaff the Idaho facility, in direct violation of their previous settlement. CCA appealed the judge's order, and the Ninth Circuit Court of Appeals affirmed the district court's order in all respects on May 23, 2016.

c.   In 2016, journalist Shane Bauer obtained a job as a prison guard at Winn Correctional Center, a CCA-run facility in Winnfield, Louisiana. Bauer spent four months as a guard at Winn, and subsequently wrote a truly stunning exposé that described widespread violence between inmates, abysmal medical and mental healthcare for Cimarron, and virtually non-existent training for staff.

50.   CoreCivic has made great efforts to conceal as much damning evidence about their practices as possible, as evidenced, for example, by its falsification of staffing hours in Idaho detailed, *supra*.

### C.  Cimarron Correctional Facility's Dangerous History

51.    For years, CoreCivic has utterly failed to properly train and supervise the staff at its detention facilities, including Cimarron Correctional Facility. Importantly, Cimarron Correctional Facility employees were not trained how to evaluate, assess, supervise, monitor or treat inmates, like Mr. Leatherman.

52.    Further, Cimarron Correctional Facility employees have a culture of failing to conduct required sight checks, failing to report violent incidents between inmates, failing to take inmate complaints seriously, and failing to report policy violations to superiors.

53.    CoreCivic additionally routinely understaffs its facilities, which leads to increased risks to inmates like Mr. Leatherman. These risks are exacerbated by the fact that the Cimarron Correctional Facility is often overcrowded.

54.    To lower overhead costs and increase profit, CoreCivic implemented policies, procedures, customs, or practices to reduce the cost of providing medical and health care services in a manner that would maintain or lower its operating costs.

55.    There are longstanding systematic deficiencies in both the number of medical personnel working at the Jail as well as the training and supervision of those employees. Michael Sizemore had long known of these systematic deficiencies and substantial risks they pose to inmates, like Mr. Leatherman, but failed to take reasonable steps to alleviate those deficiencies and risks.

56.    CoreCivic's practice of understaffing and lack of training of staff has resulted in a number of dangerous events at Cimarron Correctional Facility.

57.    For instance, in 2013, Cimarron Correctional Facility prematurely ended its agreement to house Puerto Rican inmates after a series of disruptive events at the prison.[5] In June 2015, a fight between inmates sent eleven men to the hospital. [6]

---

[5]    Cary Aspinwall, *Violence erupts at Cushing private prison,* Tulsa World (March 6, 2013), https://tulsaworld.com/news/local/violence-erupts-at-cushing-private-prison/article_f91922b5-2517-5ab7-9722-32667b2bedec.html.
[6]    Samantha Vincent, *Cimarron Correctional Facility in Cushing Remains Under Lockdown After Inmate Brawl*, Tulsa World (June 12, 2015), https://tulsaworld.com/news/local/crime-and-courts/cimarron-correctional-facility-in-cushing-remains-under-lockdown-after-inmate-brawl/article_df3760d2-7fd2-5df3-aec2-5dc7094861cf.html

58.     In September 2015, members of the Irish Mob engaged in a deadly brawl with members of the Universal Aryan Brotherhood, which left four inmates dead and several others injured. There was only one guard assigned to the unit at the time, and he had only been employed by Cimarron Correctional Facility/CCA for eight months at the time.[7] The guard, Terrance Lockett, admittedly had no idea how to react when the fight started. He later radioed for help but misidentified his location. Lockett escorted a terrified inmate back to his cell after nurses arrived, but instead of locking the inmate back in his cell, Lockett inexplicably pepper-sprayed the scared and compliant inmate. Cimarron Correctional Facility guards eventually quelled the chaotic riot, but not before it would become the deadliest prison riot in Oklahoma history.

59.     In 2015, the Oklahoma Department of Corrections sent four "notice to cure" letters to Cimarron, informing the facility that it had breached various aspects of its contract with the DOC. Two of the letters informed CoreCivic that Cimarron Correctional Facility had sent in late, inaccurate, or incomplete reports regarding critical incidents at the facility. In October 2015, the DOC sent a third letter regarding critical incidents that stated that it had still not received critical incident reports dating back to March 2015. The fourth letter admonished Cimarron Correctional Facility for failing to follow its internal policies regarding surveillance camera footage. The specifics of CoreCivic's failure to comply with surveillance footage will be detailed more thoroughly, *infra*. Further, while the DOC has the power to punish CoreCivic by issuing monetary fines, it declined to do so in connection with the four letters it sent to Cimarron Correctional Facility in 2015.

---

[7]     Clinton Adcock, *Documents and video detail deadly gang fight at private Cushing prison; facility responded to riot by destroying record*s, The Frontier (October 10, 2017), https://www.readfrontier.org/stories/documents-and-video-detail-deadly-gang-fight-at-private-prison-facility/.

60.     The DOC's Office of Inspector General's Office ("IG") began an investigation into the September 2015 riot shortly after it occurred. Then-director of the DOC, Robert Patton, additionally organized an After Action Review Team ("AART") to conduct its own investigation into the riot. Notably, however, is the fact that Cimarron/CCA employees comprised the majority of the eight-member AART.

61.     Patton's stated goal was for the AART to investigate the incident and then make recommendations to the DOC regarding possible policy changes and/or disciplinary actions to be taken against Cimarron Correctional Facility/CCA. It is unclear why Patton thought it was necessary for the AART to conduct its own investigation independent of the IG investigation.

62.     Ultimately, the IG's office completed its Administrative Report, which concluded that Cimarron Correctional Facility/CCA employees violated at least two of their own policies and also deleted at least three different pieces of surveillance footage that captured the riot. The IG's report also recommended that at least two inmates be charged with first-degree murder.

63.     The AART report, on the other hand, did not discuss the deleted video footage and failed to note that Cimarron Correctional Facility/CCA employees violated their "locked door" policy. The AART report was approximately six pages long and scant on detail. The AART report, however, was the only report released to the public in connection with the September 2015 riot. The DOC declined to release either its own IG report or the surveillance video of the incident. CoreCivic was not penalized or sanctioned by the DOC after the investigations were concluded, and no one was ever charged with murder, despite the IG's recommendation.

64.     In March 2016, a group of inmates threw another inmate off of the pod balcony. The chilling scene was captured on video by another inmate who possessed a contraband cell

phone.[8] It is unclear if the inmate who was thrown survived, or if any charges were filed. In May 2017, there was another serious altercation between Cimarron Correctional Facility guards and inmates that resulted in several inmate injuries and four guards being sent to the hospital.

65.     CoreCivic is clearly on notice that their practice of understaffing and undertraining its employees, at Cimarron Correctional Facility and other facilities, substantially increases the risks of inmates being harmed and subsequently not receiving appropriate medical treatment after those injuries.

## CAUSES OF ACTION

### CLAIM I.     NEGLIGENCE (as to all Defendants)

66.     Paragraphs 1 through 65 are incorporated herein by reference.

67.     Defendant CoreCivic is vicariously liable for the acts of its employees and/or agents under the doctrine of *respondeat superior*.

68.     Defendant CoreCivic, through its employees and/or agents at Cimarron, including Defendant Sizemore and Defendant Paine, owed a duty to Plaintiff, and all other inmates incarcerated at Cimarron, to (1) provide adequate housing and supervision to all inmates, so as to protect them from physical harm; and (2) to use reasonable medical care to provide appropriate assessment, evaluation, and treatment,

69.     As described herein, Defendant CoreCivic, through its employees and/or agents, breached its duty to Plaintiff, by failing to provide Plaintiff a ladder for climbing into his bed and by failing to provide Plaintiff with adequate medical assessment, evaluation, and/or treatment despite the obvious need.

---

[8]     Kate Carlton Greer, *Despite Continued Violence, Private Prisons 'Only Relief Value' for Overcrowding*, KGOU (March 23, 2016), https://www.kgou.org/post/despite-continued-violence-private-prisons-only-relief-valve-overcrowding#stream/0.

70.     Additionally, Defendant CoreCivic owed a duty to Plaintiff and all other inmates to hire, train, and supervise qualified, competent employees to protect and supervise inmates at Cimarron.

71.     By failing to properly hire, train, supervise and retain its employees in the reasonable administration of the prison, Defendant acted with reckless disregard for the health and well-being of Plaintiff, and all other inmates incarcerated at Cimarron, and breached the duty owed to Plaintiff.

72.     Defendant CoreCivic's negligence is the direct and proximate cause of Plaintiff's physical pain, severe emotional distress, mental anguish and all damages alleged herein.

73.     As a result of Defendants' negligence, Plaintiff has suffered personal injury, including extreme physical pain, mental pain and suffering, severe emotional distress and other actual damages in excess of seventy-five thousand dollars ($75,000.00).

**CLAIM II.     VIOLATION OF PLAINTIFF'S CIVIL RIGHTS ARISING UNDER THE FOURTEENTH AND/OR EIGHTH AMENDMENT (STATE CREATED DANGER) (42 U.S.C. § 1983)**

74.     Paragraphs 1 through 73 are incorporated herein by reference.

75.     There is a special relationship between the State and an individual in situations where the State imposes limitations upon an individual's freedom to act on his own behalf.

76.     CoreCivic has been endowed by the Oklahoma Department of Corrections with powers or functions governmental in nature, such that CoreCivic became an instrumentality of the State and subject to its constitutional limitations.

77.     CoreCivic is charged with implementing and developing the policies of the DOC and the Oklahoma Jail Standards with respect to the care and supervision of inmates in the custody

of the DOC who are housed at Cimarron, and has the responsibility to adequately staff its facilities, and adequately train and supervise its employees.

78.     It is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

79.     Here, by way of being incarcerated, Plaintiff was placed under the supervision of the State.

80.     Under the circumstances, Cimarron Correctional Facility staff, specifically, the John Doe Defendants, had an affirmative duty to protect Plaintiff based upon the limitations which the State had imposed on his freedom to act on his own behalf.

81.     Despite their knowledge that Plaintiff was at substantial risk of serious harm, or despite the obvious risk of substantial harm that Plaintiff faced by being forced to climb into a top bunk without a ladder, Cimarron Correctional Facility staff, including the John Doe Defendants, did nothing to alleviate those risks in deliberate indifference to Plaintiff's health and safety.

82.     Indeed, Cimarron Correctional Facility staff, specifically the John Doe Defendants, enhanced and/or created the dangers, through their own affirmative conduct, by removing the ladders from the bunk beds and not providing a safe alternative, as described *supra*.

83.     The John Doe Defendants' conduct, as described herein, put Plaintiff at substantial risk of serious, immediate, and proximate harm.

84. Defendants knew or it was obvious that there was a strong likelihood that Plaintiff was in danger of serious injury and harm as set forth herein.

85. Defendants failed to provide adequate housing, supervision, staffing and/or protection to Plaintiff while he was placed at Cimarron.

86.     The John Doe Defendants acted recklessly or in conscious disregard of those risks.

87.     When viewed in total, the John Doe Defendants conduct "shocks the conscience."

88.     The John Doe Defendants' violations of Plaintiff's constitutional rights were a proximate cause of Plaintiff's injuries, including physical and mental pain and suffering, and the damages alleged herein.

89.     The misconduct described in this Claim for Relief was objectively unreasonable and was undertaken intentionally, with malice, and/or willful and/or reckless indifference to Plaintiff's Fourteenth Amendment rights.

**CLAIM III.          VIOLATION OF THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (U.S.C. § 1983)**

90.     Paragraphs 1-89 are incorporated herein by reference.

**A.  Underlying Violations of Constitutional Rights/Individual Liberties**

91.     At the time of the complained events, Plaintiff, as an inmate already convicted of a crime, had a clearly established constitutional right under the Eighth Amendment to be free from cruel and unusual punishment.

92.     Cimarron Correctional Facility staff, including Defendant Sizemore and Defendant Paine, knew or should have known there was a strong likelihood that Plaintiff was in danger of serious harm.

93.     Plaintiff had obvious, severe, and emergent medical needs that were known and obvious to Cimarron Correctional Facility staff, including Defendant Sizemore and Defendant Paine. It was obvious that Plaintiff needed immediate and emergent evaluation and treatment from

a physician, but such services were denied, delayed and obstructed. Indeed, Defendants refused to have provide Plaintiff post-surgery therapy even as he continually requested such. Cimarron Correctional Facility staff disregarded the known, obvious and substantial risks to Plaintiff's health and safety.

94.     As a direct and proximate result of this deliberate indifference, as described above, Plaintiff experienced unnecessary physical pain, a worsening of his conditions, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and medical expenses.

95.     As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to damages. Plaintiff is entitled to damages due to the deprivation of his rights secured by the U.S. Constitution, including punitive damages.

### B.   Monnell/Municipal Liability (as to Defendant CoreCivic)

96.     Paragraphs 1-95 are incorporated herein by reference.

97.     CoreCivic is a "person" for purposes of 42 U.S.C. § 1983.

98.     At all times pertinent hereto, CoreCivic was acting under color of state law.

99.     CoreCivic has been endowed by the Oklahoma Department of Corrections with powers or functions governmental in nature, such that CoreCivic became an instrumentality of the State and subject to its constitutional limitations.

100.    CoreCivic is charged with implementing and developing the policies of the DOC and the Oklahoma Jail Standards with respect to the care and supervision of inmates in the custody of the DOC who are housed at Cimarron Correctional Facility, and has the responsibility to adequately staff its facilities, and adequately train and supervise its employees.

101.    In addition, CoreCivic implements, maintains and imposes its own corporate policies, practices, protocols and customs at Cimarron Correctional Facility.

102.    There is an affirmative causal link between the aforementioned acts and/or omissions of CoreCivic staff, as described above, in being deliberately indifferent to Plaintiff's serious medical needs, and the above-described customs, policies, and/or practices carried out by CoreCivic (See also, e.g., ¶¶ 42-65, *supra*).

103.    CoreCivic knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Plaintiff. By fostering the aforementioned policies, practices, and/or customs, CoreCivic has an established practice of failing to adequately assess and treat--and ignoring and disregarding--obvious or known symptoms of emergent and life-threatening conditions

104.    Nevertheless, CoreCivic failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Plaintiff's, rights to be from inmate-on-inmate violence.

105.    CoreCivic tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

106.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff 's injuries and damages as alleged herein.

107.    As a direct and proximate result of the aforementioned customs, policies, and/or practices Plaintiff suffered injuries and damages alleged herein.

108.    Plaintiff is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts and/or omissions alleged herein constitute reckless or callous indifference to Mr. Leatherman's federally protected rights.

**C.    Supervisor Liability (Applicable to Defendant Michael Sizemore)**

109.    Paragraphs 1-108 are incorporated herein by reference.

110.    There is an affirmative link between the aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Plaintiff's Eighth Amendment rights and policies, practices and/or customs that Warden Sizemore promulgated, created, implemented and/or possessed responsibility for. Such policies, practices, and/or customs, include, but are not limited to:

A.  Understaffing – especially in light of the fact that Cimarron Correctional Facility was often overcrowded;

B.  Nonexistent or inadequate training of Cimarron Correctional Facility guards;

C.  A failure to document and properly report critical incidents, including incidents involving inmate-on-inmate violence;

D.  A nonexistent or inadequate internal investigation policy;

E.  A practice of withholding and/or destroying evidence relevant to critical incident investigations;

F.  A custom of failing to report employee policy violations;

G.  A custom of failing to discipline employees who commit policy violations;

H.  A custom of failing to adequately supervise inmates, including inmates with heightened vulnerability.

111.    Warden Sizemore knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Plaintiff.

112.    Warden Sizemore disregarded the known and/or obvious risks to the health and safety of inmates like Plaintiff.

113.    Warden Sizemore, through his continued encouragement, ratification and approval of the aforementioned policies, practices and/or customs, in spite of their known and/or obvious inadequacies and dangers, has been deliberately indifferent to inmates', including Plaintiff's, serious medical needs.

114.    There is an affirmative link between the unconstitutional acts of his subordinates and Warden Sizemore's adoption and/or maintenance of the aforementioned policies, practices and/or customs.

115.    As a direct and proximate result of the aforementioned policies, practices and/or customs, Plaintiff suffered injuries and damages as alleged herein.

**WHEREFORE**, based on the foregoing, Plaintiff prays that this Court grant the relief sought, including, but not limited to, damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

Respectfully submitted,

**SMOLEN LAW, PLLC**

/s/Donald Smolen, II
Donald E. Smolen, II, OBA #19944
Laura L. Hamilton, OBA #22619
John W. Warren, OBA #33635
Hunter K. Bailey, OBA #34219
611 S. Detroit Ave.
Tulsa, OK 74119
(918) 777-4LAW (4529)
(918) 890-4529 (Fax)
don@smolen.law
laura@smolen.law
jack@smolen.law
hunter@smolen.law
*Attorneys for Plaintiff*